UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 21-CR-60013-RAR

UNITED STATES OF AMERICA

vs.

PEREZE FERGUSON,

Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court on Defendant Pereze Ferguson's Motion to Suppress

("Motion") [DE 30], which has been referred to me by the Honorable Rodolfo A. Ruiz, II.   [DE

37].   The Motion seeks to suppress the Defendant's post-arrest statements, arguing that she was

coerced into involuntarily waiving her *Miranda*[1] rights.   I have reviewed the Motion, the

Government's Response [DE 50], the Defendant's Reply [DE 53], the various Supplements to the

Motion [DE 41, 60, 61], all of the exhibits to these filings, and all other pertinent parts of the

record.   On October 4, 2021, I held an evidentiary hearing, at which I heard testimony, received

evidence, and heard argument from counsel.   Based on my review of the record and my

observations from the evidentiary hearing, I respectfully recommend that the Motion be **DENIED**.

## I.   FINDINGS OF FACT

I make the following findings of fact based on the testimony and evidence presented at the

evidentiary hearing on October 4, 2021.[2]   The parties presented testimony from Department of

_____

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The parties' pleadings provided certain background facts regarding the alleged offense and the events leading up to
the Defendant's arrest, although these facts were not addressed at the hearing.   I briefly recount some of those facts
below based on descriptions that appear to be undisputed (at least for purposes of this Motion) in the Motion and
Response.   I do so for background purposes only and make no findings regarding the alleged offense.   To be clear,

Homeland Security Special Agent Mariana Gaviria ("SA Gaviria") and Supervisory Special Agent Marco Suarez ("SSA Suarez").   The evidence also included a signed Statement of Rights form (Government's Exhibit 1), a four-part audio recording of the Defendant's post-arrest interrogation (Government's Exhibits 2-5),[3] a partial transcript of the Defendant's post-arrest interrogation (Defendant's Exhibit I-1), and a transcript of the interrogation of Damian Sherman (the Defendant's boyfriend) (Defendant's Exhibit G-1).   Although the recordings (Government's Exhibits 2-5) were not played at the hearing, I have listened to each of those recordings in full.

In June 2020, law enforcement was investigating a FedEx package shipped from the Bahamas to Fort Lauderdale, Florida, in which law enforcement had discovered 2.9 kilograms of cocaine.   Believing that the Defendant was the intended recipient of the package, an undercover agent (UC) from the Department of Homeland Security contacted the Defendant to arrange a controlled delivery of the package in the parking lot outside the Broward Mall on June 18, 2020. The Defendant arrived at the mall in a vehicle with her boyfriend, Damian Sherman ("Sherman"), and her four-year-old son, Tyler.   After communication between the UC and the Defendant and Sherman, the Defendant drove out of the parking lot without receiving the package.

Surveilling agents had a waiting Plantation Police Department officer pull the Defendant over on University Drive soon after (within 5 minutes) she left the parking lot.   SSA Suarez, along with other officers, was present when the Defendant (with Sherman and Tyler) was ultimately stopped at approximately 1:05 p.m.[4]   According to SSA Suarez, they were outside on the side of

_____

to the extent the parties disagree about specific facts prior to the Defendant's arrest, I find that those facts have no bearing on the merits of the Motion.   The facts starting with the Defendant's traffic stop and arrest reflect my credibility findings.

[3] The recordings correspond to Defendant's Exhibits I, J, K, and L, respectively, which the Defendant filed prior to the hearing.   [DE 38; Motion at n. 1].

[4] This time estimate is based on the last contact between the UC and the Defendant and Sherman (at approximately 12:58 p m.) and SSA Suarez's testimony that the Defendant left the parking lot shortly thereafter and was arrested approximately five minutes later.

the road for no more than two or three minutes before the Defendant, Sherman, and Tyler were transported to the Plantation Police Department.  While roadside, SSA Suarez spoke to the Defendant to calm her down.   Specifically, he told her that she should remain calm and that her son would be in "good care."   While the Defendant asked why she was being arrested, SSA Suarez told her to remain calm and that they would explain the situation to her when they arrived at the police station, where they could speak calmly.   The Defendant did not express any concern for her son's safety or welfare.   Because the Defendant was detained, she was handcuffed with her hands in front of her; however, she was not otherwise restrained.

The Defendant, her son, and Sherman arrived at the Plantation Police Department at approximately 1:15 p.m.   Approximately five minutes later, SA Gaviria arrived.   SA Gaviria spoke with the Defendant about her belongings and about whether she (the Defendant) could contact someone to pick up her son.   The Defendant chose to contact Dexter Rolle.   With SA Gaviria present, the Defendant called Mr. Rolle and asked him to pick up Tyler.   The Defendant did not express to SA Gaviria any concerns about her son.   During this time before the Defendant's recorded interview (see below), the Defendant and SA Gaviria were in an "open area" within the police station (meaning that there were other officers working and talking in the vicinity, though only SA Gaviria was speaking to the Defendant).

After the Defendant called Mr. Rolle, she and Tyler were placed in an interview room adjacent to the open area where she had been sitting.   The interview room was a relatively small room, with a table and chairs, but it was not a "holding cell."   The Defendant remained handcuffed, with her arms in front of her, but was otherwise not restrained.   Tyler was not restrained at all; he sat in a chair in the corner of the room, approximately three to four feet away from the Defendant, visible to everyone in the room, drawing with a pen and paper provided by

the agents.  SA Gaviria and Special Agent Nicole Nualart ("SA Nualart") were also present in the room in order to interview the Defendant.

Upon entering the room, SAs Gaviria and Nualart spent a few minutes establishing who they were and who the Defendant was.  SA Gaviria testified clearly that neither she nor SA Nualart made any promises to the Defendant nor any threats towards her (either after entering the interview room or any time prior to entering the interview room).  Nor did they make any promises or threats regarding Tyler; indeed, there was little mention of him other than noting the fact that he was drawing.  During the few minutes after the agents entered the interview room, the Defendant did not express any fears or concerns for her son.

At 1:58 p.m. (approximately 45 minutes after the Defendant arrived at the police station), the agents started a recorded interview, noting the date and time and identifying themselves and the Defendant.  *See* Government's Exhibit 2.  At the recording's start, Agent Nualart can be heard offering Tyler a paper and pen to draw with; while she asks, there is an audible, high-pitched giggle that appears to have been either from Tyler or the Defendant.  The Defendant answered the offer for paper and pen, "Yes, ma'am."  Notably, the tone of the Defendant's voice in answering this question was light, as if she was amused; the tone did not portray any nervousness, fear, or concern.  SA Gaviria read the Defendant her *Miranda* rights.  She placed a written form, titled "Statement of Rights," in front of the Defendant, so that the Defendant could read along as SA Gaviria read and explained each right aloud.  SA Gaviria (and the form, which was submitted into evidence as Government Exhibit 1) informed the Defendant (in sum) that: she had the right to remain silent; anything she said could be used against her in court; she had the right to an attorney before making any statement or answering any questions; she could have an attorney appointed for her before any questioning if she could not afford one; and even if she decided to answer

questions, she could stop the questioning at any time (including for the purpose of consulting an attorney).

SA Gaviria asked the Defendant if the Defendant understood her rights, and the Defendant readily indicated that she did (as memorialized on the form).   SA Gaviria then read the section of the form with the heading "WAIVER" and the following statement: "I have had the above statement of rights read and explained to me and I fully understand these rights.   I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity."   The Defendant then signed the form acknowledging that she understood her rights and separately signed the form below this waiver section.   The Defendant did not ask any questions about her rights.   She did not express any confusion, show any hesitation about waiving her rights, or ask for any explanations.

SA Gaviria then presented two additional forms.   One was for consent to search the Defendant's car; the other was for consent to search the Defendant's phone.   When presented with the first form, the Defendant asked, "What am I signing?"   SA Gaviria explained that the form was for consent to search the Defendant's car, after which the Defendant quickly (and nonchalantly) responded, "ok" and signed.   When presented with the second consent to search form (for the Defendant's phone), the Defendant asked, "Do I have to sign it?"   SA Gaviria immediately stated, "No, it's your choice."   The Defendant then stated that she did not want to sign it.   However, the Defendant then quickly said that she changed her mind and said the agents could "check it."   Notably, I observe from the tones of their respective voices that SA Gaviria was neither threatening nor intimidating and that the Defendant's voice did not display any indication that she felt threatened, intimidated, or nervous.

After the Defendant had completed signing the *Miranda* waiver and consent forms, the

agents began discussing the events that had led to the Defendant's arrest.   At various times during the questioning, the Defendant addressed her son (for example, admonishing him to draw on the paper he was given).   Approximately twenty-five minutes into the recording, the Defendant requested to go to the bathroom, and the recording was paused at 2:25 p.m.   Immediately before the break, the Defendant calmly instructed her son to "Go sit down now, baby, I'm going to the bathroom."

The recording resumed at 2:41 p.m., following the bathroom break.   By this time, Mr. Rolle had picked up Tyler, and Tyler was no longer present in the interview room.   SA Gavaria testified that the Defendant did not cry when her son left nor make any other statements about him once he had left.   Upon resuming the recording, SA Nualart stated "we're just gonna go back over what we talked about 'cause it wasn't recorded just because that's what we have to do." According to SA Gavaria, this was required because the Defendant began speaking before the agents were able to re-start the recording, although the agents had not asked her any questions. SA Gavaria also testified that during a break[5] the Defendant made comments to the effect that the Defendant preferred to be deported back to the Bahamas rather than facing the consequences of her arrest.   However, the agents made no promises to the Defendant that she could simply be deported, nor did they threaten to deport her.   They also did not threaten any consequence if the Defendant chose not to cooperate with agents or chose not to speak with them.

Upon restarting the recording, SA Nualart summarized that the Defendant was willing to help deliver the package that the UC had tried to deliver to the Defendant to "Dave Black."   The Defendant said, "Yes . . . if that means I could be free."   SA Nualart immediately interjected that, "I didn't say you could be free, but it will help you considerably in this situation."   The Defendant

---

[5] It is unclear whether SA Gavaria was referring to this first bathroom break or a subsequent break during the interview.

asked the agents to "explain it to me all over again, sorry."   SA Nualart then explained to the Defendant that the agents do not make any ultimate decisions; rather, they present the factors to U.S. Attorney's Office, who decides whom to prosecute and bring before a judge.   She explained that a judge then decides who actually goes to jail.   The Defendant, after asking whether she would be "locked up today," and being told "we don't know," said that "I'll help you because I feel like I'm innocent, so I'll help any way to get myself out of this situation."   Notably, however, the Defendant did not express surprise to SA Nualart's explanation or suggest that she had been told something to the contrary about being released or deported if she agreed to cooperate or if she agreed to waive her *Miranda* rights.   At 2:45 p.m., the agents ended the interview (and stopped recording) so that the Defendant could make a controlled call to "Dave Black."

Recording resumed at 3:01 p.m. with an attempted controlled call from the Defendant to "Dave Black."   *See* Government's Exhibit 3.   No one answered the call.   The Defendant then asked, "where does that leave me?" and remarked, "I need to try again to try to get myself out of this situation."   The recording reflects a break at this point.   When the recording resumed, the Defendant was relating a conversation she had with someone regarding the package delivery and insisting to agents that she had never contacted FedEx regarding the package's delivery.   The recording on Exhibit 3 concluded after less than four minutes.   The recording on Government's Exhibit 4 began at 3:52 p.m. with SA Gavaria announcing that she was about to interview the Defendant.   This portion of the interview was more confrontational, with agents expressing more skepticism of the Defendant's explanations.   During this discussion, the Defendant reiterated (11 minutes into the recording) that she was "willing to do whatever it is to get to the bottom of this." The recording on Exhibit 4 ended at 4:09 p.m.

Recording resumed at 4:38 p.m.   *See* Government's Exhibit 5.   This portion of the

recording reflects that SSA Suarez had now entered the room and took the lead on questioning the Defendant. SSA Suarez's statements reflected a belief that the Defendant was withholding knowledge about the real source or recipient of the intercepted package and was minimizing her own knowledge about the contents of the package. SSA Suarez clearly was trying to persuade the Defendant to admit more than she had already. As part of his efforts, SSA Suarez referenced the Defendant's son in the context of showing understanding for why the Defendant may have committed a crime out of necessity to provide for her family. He also encouraged the Defendant to think about her son and make choices that would protect him (presumably by cooperating with law enforcement) rather than protecting whomever was sending or receiving the package. As noted above, however, Tyler was no longer in the room at this point, having been picked up by Mr. Rolle. At one point, SSA Suarez did reference not wanting to "take the mother of a four-year-old to jail" and leave a four-year-old with a stranger. Notably, however, by this point the Defendant had been answering questions for several hours without any indication that she wanted to stop.

In total, the recordings do not reflect the agents making any promises or representations to the Defendant that she would not be arrested or prosecuted. They do not reflect any suggestions that the Defendant would or could be deported immediately to the Bahamas rather than being prosecuted. Moreover, SA Gaviria and SSA Suarez explicitly (and credibly) testified that no such promises or suggestions were made to the Defendant prior to the recorded interview or during any of the breaks. The recordings also do not reflect any threats (either explicit or veiled) made towards or regarding the Defendant's son and there is no evidence that any such threats were made during non-recorded conversations.

During the hearing, defense counsel attempted to establish that agents had spoken with, or

made representations to, the Defendant either prior to the recorded interview or during breaks between recordings.   SA Gaviria insisted that she did not question the Defendant prior to the recorded interview and that their pre-recording conversations were limited to coordinating Mr. Rolle picking up the Defendant's son.   She also testified that she had asked several other agents and officers whether the Defendant had made any statements prior to the recorded interview, and those other agents and officers said the Defendant had not.   Defense counsel sought to undermine this testimony by pointing to a few facts and circumstances.   First, SA Gaviria testified at the Defendant's pretrial detention hearing that the Defendant had made statements about wanting to return back to the Bahamas rather than "deal with this situation" and that such statements would be reflected in the Defendant's recorded interview.   However, the recordings contain no such statements.   Second, at the start of the recorded interview, the Defendant stated, "They say . . . they heard me calling FedEx.   I never called FedEx . . . ." These statements reflected an understanding that the agents believed she had called FedEx regarding the intercepted package. Yet, SA Gaviria and SA Nualart had not said anything on the recording about the Defendant calling FedEx, from which defense counsel inferred that an agent must have discussed the case with the Defendant prior to the recording.   Third, during the recorded interview, SA Gaviria referred to the Defendant's visa status, but the recording did not reflect any questions about that status.   Thus, defense counsel inferred that an agent must have questioned the Defendant about her immigration status prior to the interview.

The evidence shows that there were opportunities for unrecorded conversations between agents and the Defendant: in the brief ride from the traffic stop to the police station, in the approximately forty to forty-five minutes between the Defendant's arrival at the police station and the recorded interview, and during the breaks between recordings.   SA Gaviria gave plausible

explanations for at least some of the points from which defense counsel insinuated that non-recorded conversations had occurred. [6]   However, even if there may have been unrecorded conversations between the agents and the Defendant, there is no evidence from which I can infer or conclude that those conversations included "government agents convinc[ing] Ms. Ferguson that she would be deported to the Bahamas after she made her statement," an "unrecorded interrogation session lasting approximately twenty minutes," or that the Defendant ever expressed any fear for her son's safety.   *See* Motion ¶ 3; Reply at pp. 3-4.   Indeed, the only evidence in the record is that no such statements (by the agents or the Defendant) or non-recorded interrogation occurred.

## II.   **ANALYSIS**

The Fifth Amendment provides a privilege against self-incrimination.   *See* U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436 (1966).   In order to protect this privilege and to ensure that custodial confessions are voluntary, *Miranda* requires law enforcement authorities to advise a person subject to custodial interrogation of certain rights and to respect the person's invocation of those rights.   *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (citing *Miranda*, 384 U.S. at 467-70).   Once a person has been advised of these rights, the person may waive them, provided that the waiver is made "voluntarily, knowingly and intelligently."   *Id.* at 421 (citing *Miranda*, 384 U.S. at 444, 475).   The inquiry as to whether a waiver of *Miranda* rights has been made "voluntarily, knowingly and intelligently" contains two dimensions: (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the

---

[6] For example, SA Gaviria surmised that the Defendant could have heard other agents discussing the calls to FedEx while sitting in the "open area" before the recorded interview, even if such discussions were not directed at the Defendant.   As to the Defendant's immigration status, SA Gaviria stated that agents would have checked immigration records prior to the interview and thus would have known the Defendant's visa status without asking the Defendant.

decision to abandon it." *Id*. (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). The Court must consider the "totality of the circumstances surrounding the interrogation" in determining whether a defendant has waived *Miranda* rights through an uncoerced choice and with the requisite level of comprehension. *Id*. Among the factors to consider in determining whether a defendant's waiver of rights and subsequent statements are voluntary are "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003); *see also United States v. Ransfer*, 749 F.3d 914, 935 (11th Cir. 2014). The Government bears the burden of proving by a preponderance of evidence that the Defendant made a voluntary, knowing, and intelligent waiver of her rights. *United States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996).

Here, there is no dispute that SA Gaviria accurately advised the Defendant of her *Miranda* rights and that the Defendant signed a waiver indicating that she fully understood, and freely and voluntarily waived, those rights without any threat or intimidation or promise of reward or immunity. Nevertheless, the Defendant argues that her *Miranda* waiver was not voluntary for two reasons. She argues that agents used her son as "leverage" by placing him in the interview room with her during her interrogation and thereby coerced her into involuntarily waiving her *Miranda* rights. Motion at pp. 1, 2, 11. Second, and perhaps relatedly, she argues that agents led her to believe that she would be released (and not arrested) if she cooperated with them, thus allowing her to reunite with her child. Reply at p. 7. However, there are no facts to support either of these arguments. To the contrary, the totality of the circumstances, based on the evidence presented, demonstrates that the Defendant made a voluntary, knowing, and intelligent waiver of her *Miranda* rights.

A. **Evidence of Voluntariness**

Many facts support the conclusion that the Defendant made a voluntary, knowing, and intelligent waiver. First, SA Gaviria read the Defendant her *Miranda* rights clearly while the Defendant had an opportunity to read along on a written form. Moreover, the Defendant asked no questions regarding her rights, expressed no confusion, and showed no hesitation in signing the written waiver and agreeing to speak with the agents. Importantly, as discussed further below, she did ask clarifying questions about the two consent to search forms presented to her immediately after the *Miranda* waiver, and (at least initially) refused to sign one of them. The Defendant's reaction to the consent to search forms shows that she was not blindly acquiescing to the agents nor waiving her rights without thought and consideration. In signing the written *Miranda* waiver, she expressly represented that she understood her rights and that she was waiving them freely and voluntarily. Indeed, the waiver explicitly indicated that her waiver was made without any threat or intimidation and without any promise of reward or immunity. As the Supreme Court has observed, a signed *Miranda* waiver is "usually strong proof" of a voluntary waiver. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Typically (although not automatically) obtaining a waiver after giving *Miranda* warnings leads to a conclusion that a statement is voluntary. *See Missouri v. Seibert*, 542 U.S. 608-09 (2004).

Second, considering the factors typically used to assess voluntariness, it is undisputed that many of the hallmarks of coerced confessions are not present. Based on the Defendant's recorded interview, it is clear she is an intelligent woman who is fluent in English. The Defendant had been in custody for less than an hour when she waived her rights, and agents did not use (or threaten) any physical force. The Defendant was only handcuffed in front. She was fully clothed. She was offered food and water (and accepted water) and given bathroom breaks upon

request.    The room she was in was small but had the characteristics of a meeting room rather than a "holding cell."    Moreover, she was interviewed (at the time of her waiver) by two female agents, rather than, say, a crowd of many agents.    Significantly, having listened to the recordings of the Defendant's interview, I find there is nothing in either her words or tone of voice that in any way suggests that she felt coerced into speaking or was doing so other than through a free and voluntary choice.

### B.  <u>Son's Presence in the Interview Room</u>

The Defendant primarily argues that placing her son in the interview room with her coerced her into waiving her rights, describing his presence as an "undue influence which convinced Ms. Ferguson to waive her Miranda rights when she would not otherwise have done so."    Motion ¶ 5. However, the facts do not support this argument.    As an initial matter, beyond whatever effect Tyler's mere presence in the interview room had – and, as detailed below, I find that his presence had no undue coercive effect – there is no evidence that the interviewing agents used Tyler as "leverage" as the Defendant argues.[7]    There were no threats (explicit or implied) to his physical safety or well-being on any of the recordings, and there is no evidence that any such threats were

---

[7] The Defendant argued, in a supplement to her Motion (DE 41) and at the hearing, that statements of another agent (Special Agent Feo) to Damian Sherman during his custodial interview evinced an intent by the agents as a group to use Tyler as "leverage."   This argument is unavailing for a host of reasons.   First, SA Feo's comments to Sherman do not suggest that he was being used as "leverage."    SA Feo references Tyler twice in her interview with Sherman. The first time, she simply refers to him as "a beautiful kid," in ordinary, rapport-building, introductory conversation. The second time, she points out to Sherman that, because the Defendant has "a beautiful son in there," it is unlikely that the Defendant would "tak[e] the fall" for the crime being investigated rather than "blaming it on someone else." This latter statement does not evince an intent to use Tyler as "leverage," in that it does not threaten to impose a consequence on him.   Rather it was a fairly common-sense (and appropriate) observation of the Defendant's incentive to avoid criminal culpability rather lying to protect someone else.    Second, SA Gaviria denied having any conversations with SA Feo prior to the interviews; thus, there is no evidence of any kind of coordinated strategy for using Tyler as "leverage."    Third, and most importantly, whatever the agents' "intent," what matters in determining the voluntariness of the Defendant's waiver is what the Defendant saw, knew, or was told.   There is no evidence that SA Gaviria and SA Nualart (much less the Defendant) were aware of these statements; therefore, they could not have had any coercive effect on the Defendant.   And there is no evidence of any unrecorded acts, threats, or other statements actually made to the Defendant that further this theory of Tyler being used as "leverage."   To the extent the Defendant seeks to use the agents' alleged intent to insinuate that there were such statements made outside of the recordings, the Court cannot infer that such statements were made in the complete absence of any evidence about what the content of any such statements were.

made prior to the recorded interview or during any of the breaks.   To the contrary, the only evidence is that the arresting agents assured the Defendant that Tyler would be cared for and that SA Gaviria sought to have the Defendant arrange for a trusted family member or friend to pick Tyler up soon after SA Gaviria arrived at the police station.    Despite the allegations in the Motion, there is no evidence that the Defendant ever expressed any fear (founded or otherwise) for her son's safety or asked agents "Please don't hurt my son."    Nor is there any evidence that the agents gave her reason to have any such trepidation.    Indeed, while in the interview room, Tyler sat quietly drawing in a corner within the Defendant's view.    In fact, the Defendant's tone in responding to SA Nualart's offer of a pen and paper for Tyler belies any suggestion that the Defendant was apprehensive about his safety or even his presence.    To the contrary, the Defendant's tone (in that response and throughout the early parts of the interview) reflect someone who was calm and at ease.

As to Tyler's presence in the interview room, it is unclear why his presence (in the absence of any threats to, or fears for, his safety) would have had the kind of coercive effect the Defendant alleges.[8]    More importantly, there is no evidence to suggest that the Defendant actually felt any

---

[8] Although not exactly germane to determining the Defendant's state of mind and whether she felt coerced into waiving her rights, it is worth considering the alternatives to Tyler being in the interview room with the Defendant, particularly to the extent they show whether the agents intentionally engaged in coercion or intimidation.   The alternatives appear to have been either (1) separating the Defendant from Tyler, putting them in different rooms; (2) waiting to start any interview until someone had picked him up; or (3) arranging for child and family services to take Tyler into custody.   Defense counsel seemed to suggest at the hearing that the agents should have followed this third option, calling child and family services either at the side of the road at the time of the Defendant's arrest or at least at the police station.   However, options 1 and 3 would have been inherently, and obviously, **more** coercive than keeping Tyler with the Defendant.   Separating them into different rooms, where the Defendant could not observe her son, could have increased any concern for who was caring for him and been perceived as **adding** pressure on the Defendant to cooperate in order to be reunited with him.   Calling child and family services – essentially having government officials take custody of the child – certainly could have been perceived as a threat to separate the child from the Defendant permanently if the Defendant did not cooperate.   Although waiting for someone to pick Tyler up may have been a viable alternative, SA Gaviria and SSA Suarez convincingly testified that they were legitimately concerned with speaking to the Defendant as soon as possible.   That is because, if the Defendant was willing to cooperate (as the recordings show she eagerly was) in identifying and contacting whomever was supposed to ultimately receive the intercepted package, the chances of that cooperation being successful decreased the longer they

such coercion at all.    At the hearing, defense counsel argued that the Defendant felt the need to cooperate with law enforcement while her son was present in order to avoid "scarring him for life." The suggestion, it seems, was that the Defendant did not want her son to observe a confrontation between her and the agents.    There is no direct evidence that the Defendant felt this way – only assertions by her counsel.    Therefore, the Court can only look to the circumstantial evidence to infer whether the Defendant felt coerced to cooperate by the mere presence of her son.    Based on the circumstantial evidence, I find she did not.

The Defendant made no reference to the fact that her son was present and showed no hesitation or unwillingness to proceed in his presence.    She displayed no hesitation or nervousness when advised of her *Miranda* rights nor when she waived her *Miranda* rights.    By contrast, when presented with the two consent to search forms immediately after signing the *Miranda* waiver, she did ask questions.    She asked, "What am I signing?" regarding the form for consent to search her vehicle (which she then signed nonchalantly after receiving an explanation). When presented with form for consent to search her phone, she asked, "Do I have to sign it?" and was quickly told (in a completely non-threatening matter) that it was her choice.    She then said that she didn't want to sign, although she shortly changed her mind.    Had the Defendant actually been so overwhelmed by Tyler's presence that she felt coerced into acquiescing to the agents' demands in order to avoid any confrontation, she would not have questioned these additional forms or been willing to even initially say she did not want to consent to the search of her phone. Furthermore, had the Defendant actually felt as defense counsel asserts she did, one would expect

---

waited.   Of course, the longer they waited to begin the interview, the more one could later argue that the delay itself was an attempt at coercion as well.   In sum, it appears that the agents actually followed the most prudent course – giving the Defendant an opportunity to contact a trusted friend to pick up her son, maximizing her chance of cooperating by quickly trying to interview her following her arrest, and keeping her son with her in the meantime so that she could know he was safe.   Thus, the agents' actions actually belie an intent to use intimidation or coercion.

there to be at least a hint of fear, trepidation, or nervousness in her voice.   However, there was none.

It is also significant that the Defendant continued to speak to the agents after Tyler was picked up.   As described above, Mr. Rolle picked up Tyler sometime between 2:25, when the Defendant asked for a bathroom break, and 2:41, when the recorded interview continued.   From there on out, the Defendant could not have had any concern about having a confrontation with agents in front of her son.   Yet, even with her son gone and in the care of a trusted friend, the Defendant showed no inclination to stop the interview.   Indeed, the Defendant consistently and eagerly sought to continue attempts to cooperate with the agents (even after her initial calls to "Dave Black" failed), repeatedly saying that she would do whatever she needed to "get out of" the situation.   She also showed no hesitation with speaking, even once the conversation became more skeptical and confrontational.   These facts all belie the theory that the Defendant felt overwhelmed by the presence of her son and acquiesced to speaking with agents in order to avoid a confrontation in front of him.

The Defendant cites *United States v. Attia*, No. 17-CR-60294-WPD (DE 85) (S.D. Fla. Feb. 12, 2018) as an analogous example of the use of children as "leverage."   However, that decision is distinguishable both legally and factually.   In *Attia*, a woman was arrested after officers found four kilograms of cocaine in her car as she was driving away from her home.   The arresting officer brought her back to her house, and the woman expressed concern about her children coming home from school.   The arresting officer made statements to her that "You need to think about your children" and "any cooperation you give would be appreciated."   *Id*. ¶ 6 n. 2. From these statements, the woman believed that she would be allowed to pick up her children (and not be arrested) if she cooperated and gave a statement to the officer.   *Id*. ¶ 6.   While the court

in *Attia* found that the woman's subsequent statement was not voluntary and was the result of "overbearing her will," this conclusion was not based on the mere mention of the woman's children or the suggestion that she consider them when deciding whether to cooperate.    Rather, the court specifically found that the woman was (falsely) led to believe that she would not be arrested if she gave a statement.    *Id*. ¶ 7.    Thus, the conclusion in *Attia* was less about the use of children as "leverage" (in the sense the Defendant seems to define it) than about the officer using deception and undermining the defendant's understanding of the true consequences of waiving her *Miranda* rights (issues more specifically addressed below).    Moreover, the court in *Attia* found it significant that the defendant there had shown an intention to exercise her constitutional rights initially but changed course after being led to believe she would be allowed to pick up her children.    *Id*.    Here, there is no evidence that the Defendant showed any such intention.

### C.  <u>Deception about Arrest</u>

The Defendant's second argument also fails.    The Defendant asserts that agents led her to believe that she would be released or deported to the Bahamas, rather than arrested and prosecuted, if she made a statement.    Thus, the Defendant argues the agents obtained her *Miranda* waiver by deception (relevant to the first dimension of the inquiry described in *Moran*).    By the same token, she analogizes to cases in which statements by interrogating officers undermined defendants' understanding of the consequences of waiving their *Miranda* rights by suggesting that their statements would not be used against them (relevant to the second dimension of the inquiry described in *Moran*).    *See Hart v. Att'y Gen. of Fla*., 323 F.3d 884 (11th Cir. 2003) (officer told defendant that a "disadvantage" of having a lawyer during questioning was that lawyer would tell him not to answer questions and told defendant that "honesty wouldn't hurt him"); *United States v. Lall*, 607 F.3d 1277, 1281 (11th Cir. 2010) (officer told defendant he "wasn't going to be

charg[ed]" and told defendant's family that "any information [defendant] shared with the police would not be used to prosecute him."). However, there is no evidence that agents ever told the Defendant that she would be released or deported, rather than arrested.   Therefore, there is no evidence that the agents deceived the Defendant or undermined her understanding of the potential consequences of her waiver.

There is no evidence that agents promised the Defendant or led her to believe that she would be released or deported rather than arrested.   The recorded interview contains no such statements.   The agents credibly denied making such statements before or in between the recordings, and there is no evidence that they made such statements during those periods.   In fact, the agents' and the Defendant's statements on the recordings belie the idea that the agents had made such promises or statements before or in between recordings.

Upon restarting the recording after the initial bathroom break (at 2:41 p.m.), SA Nualart summarized that the Defendant had expressed a willingness to cooperate by calling "Dave Black." The Defendant said, "Yes . . . if that means I could be free."   But SA Nualart immediately interjected that, "I didn't say you could be free, but it will help you considerably in this situation." Had the Defendant been told (prior to the interview and prior to waiving her *Miranda* rights) that she was going to be deported or released if she gave a statement, one would expect her to have challenged SA Nualart's statement or say something to indicate that she had been told otherwise. Instead, she asked for further explanation and was told that the agents would inform the prosecutor about any cooperation; the prosecutor and a judge would then decide whether she would go to jail. In short, SA Nualart did not promise the Defendant she would be released, and SA Nualart's quick correction of the Defendant's assertion is consistent with the idea that agents had not given such assurances previously.   Moreover, the Defendant's reaction to SA Nualart did not indicate that

she had previously been promised or led to believe that she would be released in exchange for waiving her *Miranda* rights.   Later on in the interview, when SSA Suarez discussed the possible jail sentence the Defendant could face or told her that she was being arrested, the Defendant similarly did not say that she was told she would be released if she spoke to the agents or that she thought she was being deported.

The Defendant points to testimony SA Gaviria gave during the pretrial detention hearing indicating that the Defendant had expressed an intent or preference to return to the Bahamas rather than face prosecution.   SA Gaviria similarly testified at the hearing on the instant motion that, during a break in recordings, the Defendant expressed this desire.   Putting aside any debate over whether such statements can be found on the recordings (they are not), the fact that the Defendant expressed a desire to return to the Bahamas does not indicate that the agents ever suggested that was an option or an alternative to arrest.   In short, there is no evidence from which the Court can even infer that the Government promised the Defendant that she would not be prosecuted if she waived her *Miranda* rights or said anything to suggest that her statements would not be used against her.   Thus, her second argument fails.

### III.   <u>CONCLUSION</u>

Having considered the totality of the circumstances, I find that the Defendant made a voluntary, knowing, and intelligent waiver of her *Miranda* rights.   For the foregoing reasons, I respectfully **RECOMMEND** that the Defendant's Motion to Suppress [DE 30] be **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and

shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary, in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

      DONE AND SUBMITTED at Fort Lauderdale, Florida, this 18th day of October, 2021.

JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE