**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-CR-60013-RAR**

**UNITED STATES OF AMERICA**

**vs.**

**PEREZE FERGUSON,**

**Defendant.**
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court on Defendant Pereze Ferguson's Motion to Dismiss Indictment Based on Government's Deportation of a Material Witness ("Motion") [DE 29], which has been referred to me by the Honorable Rodolfo A. Ruiz, II.   [DE 79].   The Motion alleges that the Government violated the Defendant's Sixth Amendment right to compulsory process and Fifth Amendment right to due process by deporting potential witness Damian Sherman.   I have reviewed the Motion, the Government's Response [DE 52], the Defendant's Reply [DE 56], all of the exhibits to these filings, and all other pertinent parts of the record.   On November 24, 2021, I held an evidentiary hearing, at which I heard testimony, received evidence [DE 95, 97], and heard argument from counsel.   Based on my review of the record and my observations from the evidentiary hearing, I respectfully recommend that the Motion be **DENIED**.

### I.    FINDINGS OF FACT

I make the following findings of fact based on the testimony and evidence presented at evidentiary hearing on November 24, 2021.

In June 2020, law enforcement was investigating a FedEx package (hereinafter "the package" or "the parcel") shipped from the Bahamas to Fort Lauderdale, Florida, in which law

enforcement had discovered 2.9 kilograms of cocaine.  On June 18, 2020, an undercover agent (UC) from the Department of Homeland Security's Homeland Security Investigations (HSI) called a phone number associated with the package seeking to speak to "Dave Black" (the package's listed recipient).  Instead, the Defendant answered the phone.  The Defendant asked about the UC's location, and the UC claimed that he lived in the Defendant's complex.  However, when pressed for details about where he lived in the complex, the UC said he had just left for work and could meet the Defendant at the Broward Mall to give her the package.  The Defendant agreed to meet the UC at the Broward mall 30-60 minutes later.

The Defendant arrived at the mall driving a vehicle with her boyfriend, Damian Sherman ("Sherman"), and her four-year-old son, Tyler.  Once at the mall, the UC called the Defendant. When the Defendant asked the UC what he was wearing, the UC indicated he was driving a black Escalade.  When the Defendant asked the UC for his phone number, the UC answered that he would call her back in 15 minutes.  The UC later sent text messages to the Defendant and indicated that he was the one texting her from that number.  When the UC called the Defendant again, Sherman answered.  Sherman indicated he was "Pereze's boyfriend" and instructed the UC to meet him outside the mall's Regal movie theater.  The UC walked up to the front of the movie theater, while talking on the phone with either the Defendant or Sherman.  During that call, Sherman asked the UC where the package was.  At the time, the UC was not carrying the package, and the UC indicated that the package was in his car.  At some point, either the Defendant or Sherman asked the UC, by text message, whether he was a police officer.  Eventually, the UC asked, "Do you want the package?"  The Defendant then drove out of the parking lot without accepting the package.  Agents from HSI and local agencies conducted a traffic stop and detained the Defendant and Sherman, bringing them (and the Defendant's son) to the Plantation Police

Department.

HSI Special Agent Christina Feo, Task Force Officer Natasha King, and Technical Enforcement Officer Christopher Torres initially interviewed Sherman.   During the initial interview, Sherman indicated that he was the Defendant's boyfriend and that they had been dating since January or February of that year.   (Ex. G-1 at 3).   He indicated that he had been trying to go back home to the Bahamas, in order to get married (to a previous girlfriend), and ended up "staying over my time."   *Id*.   He said he was initially trying to return to the Bahamas in 2019, but was delayed by Hurricane Dorian[1] and then the pandemic.   *Id*.   at 4.   Eventually he broke up with his ex-girlfriend and began living with the Defendant in an apartment in Pembroke Pines about two months prior to the interview.   *Id*. at 6-8.   Special Agent Feo confirmed with Sherman that he was in the United States on a B1 visa that had expired (although Sherman said he was not sure whether it had expired).   *Id*. at 17-20.   Special Agent Feo informed him that if he had overstayed his visa, then he was in the country illegally.   *Id*. at 20.

When asked why he and the Defendant had gone to the mall, Sherman indicated they were supposed to meet somebody to pick up a box that had been dropped at the wrong address.   *Id*. at 21.   He thought the box was supposed to go to the Defendant's aunt's house for somebody.   *Id*. at 22.   He explained that he and the Defendant had started a shipping business to send groceries and goods to the Bahamas.   *Id*.   He consistently denied knowing to whom the package was going or what it contained.   He explained, "I was supposed to be going on a ride with [the Defendant] just to get another package."   *Id*.   at 23.   He also denied that the Defendant told him what could have been in the package.   *Id*. at 25.   Sherman stated, "she just tell me that she had to go make a pickup this morning."   *Id*.   When asked what made him go with the Defendant, Sherman said,

---

[1]  Hurricane Dorian hit the Bahamas in August 2019.

"Because I always go with her.   I never think anything suspicious. . . .   She told me she was going to get a personal package from somebody.   But I don't know."   *Id*. at 25-26.

The agents continued to press Sherman about his knowledge regarding the package, explaining what a conspiracy is and impressing on him that he needed to help himself by being truthful.   *Id*. at 26-31.   Sherman continued denying knowing that the package contained drugs. *Id*. at 27.   When asked what his plan had been for the day when he woke up, Sherman said he planned on sitting at home and relaxing.   *Id*. at 31-32.   He repeated that the Defendant "t[old] me she was coming to pick up a package" and again explained that he and the Defendant operate a "Shop and Ship" business.   *Id*. at 32.   He stated, "So, picking up shipping boxes, like, that ain't . . . like it's nothing irregular about that to me.   Like I didn't thought it was nothing irregular."   *Id*. Again insisting that he did not have any knowledge about the package being received, he stated, "I don't know exactly what's going on with that.   All I know is . . . she said a package is coming and would I like to come with her and get it.   And I come with her."   *Id*. at 34.   After acknowledging that their business was to ship packages to the Bahamas (not from the Bahamas) and again denying knowing anything about the package involved in the case (*Id*. at 34-35), Sherman was asked about what had happened at the mall.   Sherman repeatedly explained that he did not see the person they were supposed to meet, so they left.   *Id*. at 36-38.   At 2:30, approximately 27 minutes after the start of the interview, this portion of the interview concluded.

Approximately 24 minutes later, the interview resumed, with Supervisory Special Agent Marco Suarez leading the questioning.   This portion of the interview was much more confrontational, with Agent Suarez challenging Sherman's veracity, describing severe legal consequences that Sherman could face, and trying to persuade Sherman to help the agents by telling the truth.   He told Sherman that once they were done, Sherman would go to jail and face

seven to ten years in prison based on three kilograms of cocaine.   (Ex. H-1 at 7).  He also told

Sherman that Sherman would be deported back to the Bahamas after a prison sentence.  *Id*.

Sherman responded by saying:

> Let me give you my most truthful statement.   I don't know anything about what
> was in it or where it was going.   If you could talk to her and she knows something,
> then maybe she could help you, but I . . . honest to God, I don't know nothing or
> what was in it, I don't know where it was going, I literally only ride with her
> because that's my girlfriend.   She tells me, we going to get . . . to pick up a package
> this morning . . . for real, I'm being honest with you man to man, like man to man
> . . . like for real.   If that's what you want to do, I don't know if she trying to do that
> but . . . because I don't even know the people.   Like, I . . . honest to God I don't
> know . . . where it's going . . . I don't know who it came from.

*Id*. at 8-9.   When challenged that he knew the Defendant was taking the parcel to someone,

Sherman stated, "No, I thought that was just a regular . . . a regular box that she was going to get .

. . and give to somebody else."   *Id*. at 9.

Agent Suarez continued to press Sherman to explain why, if Sherman did not think there

was anything illegal or unusual in the package, he instructed the UC to get out of his car and walk

in front of the movie theater.   *Id*. at 9-12.   He also told Sherman that the cocaine in the package

could ultimately be worth up to half-a-million dollars and that those who sent it would look to hold

the Defendant, Sherman, and their children "accountable" for the lost shipment.   *Id*. at 13.

Sherman again denied knowing what was in the package.   In response to why he told the UC to

walk in front of the movie theater, Sherman responded, "First of all, I saw my girlfriend was about

to accept something from a man, so I was trying to figure out what type of guy is this?   What type

of predator is this trying to get this girl to come over there, but I don't know nothing . . . nothing

about no drugs or nothing like that."   *Id*. at 14 (hereinafter "the predator comment").   Agent

Suarez questioned Sherman why, if his concern was that the person offering the package could be

a danger, he asked the UC if he was "police."   *Id*. at 17, 21.   Sherman eventually replied, "I don't

know that . . . I didn't do that," (*id*. at 21) though he again stated that "I tried to figure who this is

trying to get in contact with my girlfriend."  *Id*. at 22.

In addition to continuing to deny any knowledge of the package's contents and sender,

Sherman also disclaimed any knowledge of where the Defendant was going to bring the package

or any other plans that day.   When asked to whom they were going to deliver the package,

Sherman said, "I have no clue.   I don't know if it was going to a shipping company.   I don't know

if it was going to a[n] airline, like . . . I literally don't know."   *Id*. at 26.   When asked if the

Defendant had said what they were going to do after picking up the package, Sherman replied,

"No.   She ain't never mention nothing like that."   *Id*.   Sherman said that afterwards, "I was going

back home.   We had to go on back home. I was going home."   *Id*. at 27.   As to the Defendant's

plan after that, Sherman said, "I have no idea."   *Id*.   Sherman again emphasized that he had

nothing to do with the package and knew nothing about where it was coming from or where it was

going.   He stated,

> Whatever was going on today was gonna happen whether I was there or not.   I
> don't know nothing about it.   I don't know what . . . what was going on.   I thinking
> it's just a regular . . . regular fucking pickup.   I don't know what the hell's going
> on.   You telling me she done call Fedex seven, eight times.   I don't know nothing
> about this.   The only thing I know is when she's on the phone with the guy this
> morning trying to get her to meet up by the mall.   That's when I take her and try
> to understand like, what the hell's going on?

*Id*. at 28.

Sherman continued to tell Agent Suarez that he was willing to help the agents but did not

know anything about the package or to whom it was ultimately going.   Agent Suarez made

additional references to taking Sherman to the Federal Detention Center and him having his "day

in court."   *Id*. at 34, 42-43.   Sherman continued to insist, however, that he did not have any further

information.   The interview ended at approximately 3:44 p.m., approximately an hour and forty

minutes after the initial portion of the interview had begun.

After Sherman's interview, the interviewing agents summarized Sherman's statements for the case agent, Special Agent Mariana Gaviria.   The agents had varying assessments of Sherman's veracity but concluded that he had not provided any material information, having denied any knowledge about the package numerous times.   Agent Gaviria concluded that his statements were not favorable to the Defendant, although she was not made aware of Sherman's specific "predator comment" until she listened to the recording of the interview several days later.   However, when pressed by defense counsel, Agent Gavaria stated that even if the "predator comment" gave some explanation for why Sherman and the Defendant were at the mall, Agent Gavaria did not consider the statement material given all of the surrounding circumstances, specifically the facts that the Defendant had made arrangements to meet the UC to get the package and asked the UC if he was "police."

On June 18, Agent Gavaria presented the information garnered from Sherman's interview, the Defendant's interview, and the rest of the investigation to the Assistant U.S. Attorney on duty. Although there is little evidence of what precisely was relayed to the U.S. Attorney's Office regarding Sherman, from the testimony presented it is likely that the U.S. Attorney's Office was told that Sherman consistently denied knowledge regarding the package's contents, origins, and destination multiple times.   The U.S. Attorney's Office declined to prosecute Sherman due to a lack of evidence.

Because Sherman had overstayed his visa, the agents detained him and transferred him to U.S. Customs and Border Protection (CBP) to initiate deportation proceedings.   Although Agents Gavaria and Suarez had some discussion about this decision, it was a matter of practice when encountering an individual without legal immigration status to transfer them for immigration

proceedings.   On June 18, Sherman was ultimately brought to CBP Officer Daniel Ramos at the Ft. Lauderdale International Airport to process Sherman for deportation.   Officer Ramos and other CBP officers determined that Sherman had overstayed his visa by 522 days and was therefore deportable.   Officer Ramos informed Sherman of his right to a hearing in Immigration Court to determine whether he could remain in the United States, and Sherman requested such a hearing. Ex. R at 33.   After completion of various checklists considering a number of factors (see exhibit 8 and exhibit R at 2-3), Officer Ramos issued Sherman a Notice to Appear (NTA) ordering him to appear at an immigration hearing at a date and time to be set in the future.   *Id*. at 49.   When CBP initiates deportation proceedings against an individual, it is common for an NTA to lack a specific hearing date and time because officers do not know what dates and times the court will have available.   After Officer Ramos issued the NTA, Sherman was brought to the Krome immigration detention facility ("Krome").   Officer Ramos's decision to issue Sherman an NTA and to have him brought to Krome was in accordance with the Department of Homeland Security processes, policy, and training.

Once Sherman was at Krome, an official from U.S. Immigration and Customs Enforcement ordered Sherman released on his own recognizance on June 19, 2020.   Ex. R at 53. Release of individuals subject to deportation proceedings was particularly common during the early phases of the COVID-19 pandemic in order to limit the number of in-custody detainees. Sherman's release order was contingent on Sherman abiding by a number of conditions.   The conditions included that Sherman report for any hearing or interview as directed, that he report to a duty officer one year after his release, and that he enroll in the "Alternatives to Detention" (ATD) program.   *Id*.   The ATD program included electronic monitoring through a GPS ankle monitor or other similar device.   *Id*.

Sherman was terminated from the ATD program approximately 3 weeks later, on July 10, 2020, for failing to make contact with the ISAP[2] office as directed.  Ex. 5.  Neither immigration authorities nor other law enforcement has located Sherman since.  Sherman was issued a second notice to appear on September 17, 2021, indicating that his immigration hearing will be on March 4, 2022.  He has never appeared before an Immigration Judge.  Therefore, no Immigration Judge has issued an order of removal against Sherman, and he has not been deported from the United States.

Neither party presented any substantive evidence indicating whether Sherman has returned to the Bahamas or, if so, when he left the United States.  Approximately a week before the evidentiary hearing (in November 2021), Daniel Riemer, a private investigator for the Defendant, ran records checks and visited the address that Sherman had provided to immigration officials. These were Mr. Riemer's first attempts to locate Sherman.  The address appeared abandoned, and the records checks did not reveal any more recent whereabouts.  Mr. Riemer also found Broward County court records indicating that the state court had issued a capias warrant when Sherman failed to appear at an April 23, 2021 hearing on a misdemeanor battery case.

## II.  ANALYSIS

The Fifth Amendment guarantees a criminal defendant due process of law.  U.S. Const. amend. V.  The Sixth Amendment guarantees a criminal defendant the use of compulsory process for obtaining witnesses in her favor.  U.S. Const. amend. VI.  To show a violation of her due process rights or compulsory process rights stemming from deportation of a witness, a defendant is required to show that there is a reasonable basis to believe that the witness's testimony would

---

[2] Although not explained at the hearing, "ISAP" is the Intensive Supervision Appearance Program, which is part of the Immigrations Customs Enforcement (ICE) Enforcement and Removal Operations (ERO)'s Alternatives to Detention Program.  *See* https://www.ice.gov/detain/detention-management (last visited Dec. 1, 2021).

be material and favorable to her and that the government acted in bad faith in deporting the witness. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872–73 (1982); *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010) (citing *Valenzuela-Bernal*, *supra*; *United States v. Schaefer*, 709 F.2d 1383, 1386 (11th Cir.1983); *United States v. Gastelum–Almeida*, 298 F.3d 1167, 1174 (9th Cir.2002)).

A.  **Deportation (or Lack Thereof)**

Before reaching the issues of materiality and bad faith described in *Valenzuela-Bernal* and its progeny, the Court must consider whether the Government actually made Sherman unavailable by deporting him.   A due process violation occurs when the Government "exercise[s] its sovereign powers so as to hamper a criminal defendant's preparation for trial."   *California v. Trombetta*, 467 U.S. 479, 486 (1984).   However, subsumed within this principle is the idea that the Government is responsible for the defendant's inability to access particular evidence.   Because the Defendant cannot show that the Government actually deported Sherman, I find that she fails to meet her burden of showing a violation of either her due process or compulsory process rights.

The Defendant's motion was predicated on the assertion that the Government had deported Sherman, relying on *Valenzuela-Bernal*.   At the evidentiary hearing, the Defendant conceded that her case does not fall squarely within *Valenzuela-Bernal* because the evidence shows the Government did not actually deport Sherman.   Rather, the Defendant now argues that – by scaring Sherman with the possibility of criminal prosecution, initiating deportation proceedings, and releasing Sherman from custody – the Government's actions were "tantamount to deportation." The Defendant further argues that the Government should have filed a complaint seeking a material witness warrant to ensure that Sherman remained in the country so that the Defendant could seek to preserve his testimony through a deposition.   The Defendant concedes that she has found no

analogous case supporting this "tantamount to deportation" theory or imposing an obligation upon the Government to seek a material witness complaint.   The Defendant suggests that this case may be one of first impression.   The Defendant's lack of support for these theories, particularly in light of existing Eleventh Circuit case law, is fatal to her motion.

The Eleventh Circuit has rejected motions similar to the Defendant's that involved witnesses who voluntarily removed themselves from the United States – even in the face of deportation proceedings – rather than being deported by the Government.   In *United States v. Saintil*, 753 F.2d 984 (11th Cir. 1985), the Eleventh Circuit considered a similar motion by defendants charged with alien smuggling based on the belief that they had operated a vessel carrying approximately 165 undocumented Haitian nationals.   While the majority of the vessel's passengers were placed in detention centers, approximately fifteen of them returned to Haiti after being given the option of returning to Haiti voluntarily in order to avoid detention in the United States.   *Id*. at 987 & n.3.   The defendants claimed that two of those fifteen people were the ones who had actually controlled the vessel (not the defendants) and that the government had violated the defendants' Fifth and Sixth Amendment rights by deporting those two witnesses.   *Id*.   at 987.

The Eleventh Circuit found that the *Saintil* defendants had not satisfied their burden under *Valenzuela-Bernal*.   *Id*.   In so finding, the Eleventh Circuit explained that, "[f]irst, the record does not show that the government actually deported or sent away the witnesses claimed to be material."   *Id*.   Rather, it appeared the missing witnesses were among those "permitted to return to Haiti voluntarily in order to avoid detention in the United States."   *Id*. at 987 n.3.   Importantly, while the Eleventh Circuit went on to find that the defendants had also failed to establish that the missing witnesses would offer material and favorable testimony, it cited the materiality finding as a second, separate reason why the defendants had failed to meet their burden.   *Id*. at 987.   Thus,

*Saintil* appears to hold that the witnesses' decision to voluntarily leave the United States, as opposed to the government actually deporting them, was itself an independent reason for rejecting the defendants' motion.

The Eleventh Circuit again distinguished between voluntary repatriation and forced deportation in *United States v. McCullough*, 166 F. App'x 469 (11th Cir. 2006).   There, McCullough had been charged with transporting and harboring an illegal alien, Venegas.   After Venegas was denied entry into the United States (having previously entered illegally), he was discovered living in the United States with McCullough.   *Id*. at 469.   Venegas, who was apprehended by Border Patrol, admitted that McCullough had picked Venegas up in Houston after paying a smuggler for transporting Venegas into the United States.   *Id*. at 470. "Venegas was informed that he could be administratively charged with violating immigration laws, or he could waive his procedural due process rights and be eligible for an immediate, voluntary return to Mexico." *Id*.   Venegas chose the latter and was returned to Mexico before McCullough's trial. *Id*.   Like the Defendant here, McCullough sought to dismiss the indictment against her, arguing that the government had denied her Sixth Amendment rights by "facilitat[ing] Venegas' return to Mexico" and "allowing Venegas to leave."   *Id*. at 471.   Following *Saintil*, the Eleventh Circuit similarly found that McCullough had not satisfied her burden under *Valenzuela-Bernal* because Venegas was not deported; rather he was "given the option of leaving voluntarily or being detained." *Id*.   Again, the Eleventh Circuit addressed a lack of materiality and bad faith as its "second" reason why McCullough had not met her burden.   *Id*.

In this case, Sherman's apparent departure is analogous to that of the missing witnesses in *Saintil* and *McCullough* and, in some significant respects, even less "tantamount to deportation" than in those cases.   Assuming Sherman has, in fact, returned to the Bahamas – a fact that both

parties presume, though neither has demonstrated – he returned there voluntarily.  He was not ordered removed or deported from the United States.  Although Sherman faced deportation proceedings, the prospect of such proceedings in *Saintil* and *McCullough* did not lead the Eleventh Circuit to equate those witnesses' departures with deportation or something "tantamount to deportation."  Indeed, whereas the government actually returned the witnesses in *Saintil* and *McCullough* to their respective home countries, here Sherman departed (if at all) through his own means and arrangements without Government involvement or knowledge, placing the fact and timing of his departure much farther out of government control than in those cases.  The pressure on Sherman to leave, at least from an immigration perspective, was also much less stark and coercive (and, thus, much less "tantamount to deportation") than in *Saintil* and *McCullough*.  The witnesses in those cases were faced with the prospect of immigration detention (and likely swift deportation anyway) if they did not choose to voluntarily repatriate.  By contrast, Sherman was released from immigration custody with a notice to appear for a hearing at an undetermined date, would not have faced a removal order until March 2022 (based on the recently re-issued NTA) at the earliest, and even then, only after the opportunity to contest removal before an Immigration Judge.  In short, absent Sherman's choice to leave the United States, the Government's efforts to deport him would not have come to fruition until after the Defendant's current trial date.

The Defendant's "tantamount to detention" argument relies heavily on the notion that the Government gave Sherman a strong incentive to flee the country when Agent Suarez threatened him with arrest and a lengthy prison sentence (even though he was ultimately not arrested).  This is a factor not present in *Saintil* and *McCullough*.[3]  However, to the extent the Government might

---

[3] The possibility of criminal prosecution may have been present in both cases.  *Saintil* notes that there was testimony that the missing witnesses had, in fact, steered the vessel, although only pursuant to the defendants' orders.  753 F.2d at 987.  However, it is unclear whether the government knew of the

have known that the possibility of prosecution gave Sherman an incentive to return to the Bahamas, his flight was much less certain than in *Saintil* and *McCullough* and was not facilitated by the Government.   Moreover, as described above, the Defendant offers no case support for the argument that the Government is responsible for a potential witness, whom it questions but ultimately determines it cannot arrest, who then decides to hide (whether inside or outside the country).   Nor has Defendant offered any support for the premise that the Government is obligated to seek a material witness warrant to detain a potential defense witness who may choose to return to his home country.[4]   Ultimately, it was Sherman who made himself unavailable.   For this reason, Plaintiff does not meet her burden to demonstrate that dismissal of the indictment is required.

### B.  **Materiality**

The Defendant also has not sufficiently demonstrated that Sherman would offer testimony both material and favorable to her.   In determining whether the witness's testimony would be "material and favorable," the Court must consider whether the testimony "could have affected the judgment of the trier of fact."   *Valenzuela-Bernal*, 458 U.S. at 873-874 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).   In other words, "implicit in the requirement of materiality is a

---

witnesses' steering the vessel at the time the witnesses chose to return to Haiti or whether the government had suggested to those witnesses that they could face prosecution for the alien smuggling venture.   In *McCullough*, Venegas could have been prosecuted for illegal re-entry after deportation (8 U.S.C. § 1326(a)).   However, the opinion only indicates that Venegas was told he would be administratively charged with immigration offenses.   Regardless, such an offense would carry a relatively minor sentence in comparison to the seven-to-ten years described by Agent Suarez to Sherman.

[4] As discussed below, the Defendant's argument that dismissal of the indictment is required because the Government did not inform her in sufficient time that Sherman was a material witness in order to allow her to petition for a material witness warrant herself is unavailing.   The Defendant was obviously aware at the time of her arrest of Sherman's presence and ability to offer testimony on the subjects described as material in the Defendant's motion.   Moreover, at least by June 22, 2020 (the date of the Defendant's pretrial detention hearing and three days after Sherman's release from Krome), defense counsel had an understanding that Sherman had been detained by immigration authorities and released on bond.   *See* DE 19 at 23-24.

concern that the suppressed evidence might . . . affect[] the outcome of the trial." *Id*. at 868

(quoting *Brady v. Maryland*, 373 U.S. 83, 104 (1963) (cleaned up)).  This standard requires that

the Court evaluate the potential testimony "in the context of the entire record" including the

strength of the remaining evidence in the case.  *Id*. (citing *Brady*, 373 U.S. at 112-113). It also

requires that the potential testimony would have been helpful "in ways not merely cumulative to

the testimony of available witnesses."  *Id*. at 873. When a defendant has been deprived of the

opportunity to interview a witness, courts recognize that a defendant may not be able to represent

precisely how the witness would testify.  *See id*. at 871, 873.  Nevertheless, the defendant must

make a plausible showing that the witness's testimony would have been material, not merely that

such testimony would have provided a "conceivable benefit."  *Id*. at 866-867, 873.

Much of the Defendant's argument regarding materiality centers around Sherman's

"predator" comment and facts that the Defendant believes would have raised concerns about the

UC's behavior.  The Defendant posits that Sherman would testify to his conversations with the

UC, that the UC was not carrying the package when he walked in front of the movie theater, and

that Sherman was concerned with the entire scenario based on these facts and the UC's prior

statements to Ferguson.[5]  The Defendant argues that Sherman's testimony would explain why

Sherman was concerned with the UC, why Sherman decided to watch the UC approach the movie

theater, and "why Sherman ultimately decided that Ms. Ferguson should not take delivery of the

FedEx package."  Motion at 8-10.  Based on the "predator" comment, the Defendant asserts that

it is plausible that Sherman would testify that the UC's behavior caused Sherman to fear for the

Defendant's safety.  The Defendant asserts that this testimony would be material because it would

---

[5] For example, the Defendant points to the UC's refusal to bring the package to the original delivery
address, his statement that he was taking a lunch break within an hour of heading to work, his answering
the question of what he was wearing by saying what kind of car he was driving, and his refusal to provide
his telephone number.  *See* Motion at 9-10.

offer an innocent explanation either for why the Defendant went to the mall or why she left the mall without receiving the package.[6]

However, there are two problems with the Defendant's theory that Sherman's potential testimony about his concerns would be material.   First, the proffered testimony does not establish any facts (beyond Sherman's subjective thoughts, conclusions, and state of mind) that are not cumulative with other evidence.   To the extent the Defendant is arguing that the UC's statements and other behavior created a reasonable concern that the UC was a danger (and thus provided an explanation for the Defendant leaving without the package), those statements and behaviors are documented by audio and video recordings and the testimony of other witnesses.   For example, the UC's explanation that he could not bring the package to the Defendant at her apartment or other address because he was on the way to work, his offer to meet her at the mall soon thereafter (despite having said he was just heading to work), his describing his vehicle instead of his clothing, and his refusal to give his phone number are all captured on audio recordings that can come into evidence.   Sherman's recounting of those statements (to the extent they were made to him) are cumulative.   Similarly, the fact that the UC was not carrying a package when he went to meet the Defendant and Sherman at the movie theater is apparently on video and was observed by surveilling agents (and appears to be undisputed).   Therefore, the only non-cumulative testimony that Sherman could offer is how he interpreted and thought about these facts.

The second, related problem is that Sherman's subjective thoughts, conclusions, and state

---

[6] The Defendant gives shifting arguments for her theory of what Mr. Sherman's "concerns" would explain. On one hand, the Motion frames Sherman's concerns as the reason why Sherman and the Defendant left the mall without the package.   Motion at 10.   Yet at the hearing, defense counsel's argument specified that Sherman's concerns about the UC being a "predator" would explain why the Defendant and Sherman went to the mall in the first place.   This second theory is also at odds with a suggestion that Sherman would testify "why Sherman tried to convince Ms. Ferguson to meet with the unknown male (in spite of Ms. Ferguson's concerns [based on her interactions with the UC])."   Motion at 8.

of mind are irrelevant.   What matters is the **<u>Defendant's</u>** state of mind and the extent to which actions she took shed light on her state of mind.   Whether Sherman was concerned that the UC was a "predator" or whether Sherman thought they should leave the mall without the package does not illuminate what the Defendant thought.   Therefore, Sherman's potential testimony about his thoughts is not material.

It is also worth noting that, whether the Defendant's theory is that Sherman's "predator" concerns were the reason for leaving the mall or going to the mall in the first place, portions of Sherman's recorded interview conflict with this theory.   As to why the Defendant and Sherman left the mall without the package, Sherman initially told agents that they left because they simply did not see the person with the package.   Ex. G-1. at 36-38.   Sherman only described his "predator" concern later when pressed by Agent Suarez (and, even then, specifically in response to a question of why he asked the UC to walk to the movie theater).   To the extent that the Defendant believes the "predator" concerns could explain why the Defendant went to the mall initially – in order to investigate whether the person calling the Defendant was a "predator" (as the Defendant argued at the evidentiary hearing) – Sherman's interview provides even less reason to believe he would testify to that effect.   Sherman told agents that he had gone with the Defendant so she could pick up a package (*id.* at 23), that he always went with her (*id*. at 25), that he didn't think there was anything "suspicious" (*id*.) or "irregular" (*id* at 32) about it, and that "the Defendant said a package is coming and would I like to come with her and get it." (*Id*. at 34).

Beyond the "predator" comment and its related concerns, the Defendant argues that Sherman would offer material testimony by describing the Defendant's conduct the preceding week, what the Defendant had done earlier that day (prior to going to the mall), what the Defendant was going to do with the remainder of the day (after going to the mall), and why the Defendant's

son and homemade food were in the vehicle.   However, the Defendant offers little description of what Sherman would say about these matters or how that testimony would be material.   While the Defendant has not had the benefit of interviewing Sherman, and thus potentially asking these questions directly, no one knows better than the Defendant what Sherman observed her doing during those times.   *See Valenzuela-Bernal*, 458 U.S. at 871 (in discussing a defendant's limitations in establishing how a missing witness would testify, observing that the defendant was in the best position to know what the deported witness may have said or done in the defendant's presence).   Absent such further detail and explanation, the Court cannot conclude that the Defendant has made a plausible showing that such testimony would be material.

Further, to the extent Sherman spoke of such matters in his interview, he demonstrated a complete lack of knowledge.   As to what preceded their trip to the mall, Sherman repeatedly expressed that the Defendant had simply asked him to come with her to pick up a package (which he found routine and unordinary).   Importantly, he repeatedly denied knowing anything about the package's origins, contents, destination, or circumstances and denied the Defendant making any statements about what the package would contain.   As to what supposedly would happen after receiving the package, Sherman specifically said that the Defendant had not told him what she planned to do and he did not know what her plans were.   Ex. H-1 at 26-27.   Thus, the Defendant has failed to establish that Sherman's testimony on these matters would be material and favorable.

### C. **Bad Faith**

The Defendant also fails to establish that the Government acted in bad faith.   As a preliminary matter, the record lacks any of the typical harbingers of bad faith.   There is no evidence that the Government or its agents acted with an intent to "gain some tactical advantage" over the Defendant, s*ee United States v. Marion*, 404 U.S. 307, 325 (1971), nor exhibited a

conscious effort to suppress exculpatory evidence.   *Trombetta*, 467 U.S. at 488.   Nor is there

evidence that Government agents departed from normal practice in either referring Sherman for

deportation proceedings or releasing him pursuant to the ATD program.   *See id*. (officers were

acting "in good faith and in accord with their normal practice") (internal citations omitted); *see*

*also De la Cruz*, 601 F.3d at 1213 (Coast Guard was following standard operating procedure in

returning migrants to Cuba).

The question of bad faith in this specific scenario comes down to whether the Government

deported Sherman knowing that he could offer material and favorable testimony to the Defendant.

*See Valenzuela-Bernal*, 458 U.S. at 872 (responsibility to execute immigration policy justifies

deportation of illegal-alien witnesses upon a "good-faith determination that they possess no

evidence favorable to the defendant in a criminal prosecution"); *McCullough*, 166 F. App'x at 472

(government did not act in bad faith in allowing witness to leave the United States voluntarily

because witness had only provided incriminating statements).   Given Sherman's repeated,

consistent, and adamant denials of having any knowledge regarding the package's origins,

contents, or destination, the Government reasonably concluded that Sherman had no material

testimony to offer.   Not only did Sherman deny knowledge of the package itself, he also denied

any interactions with the Defendant that would have provided insight into her knowledge of those

matters; he repeatedly indicated that the Defendant simply asked him to go with her to pick up a

package.   It does appear that the Government did not closely scrutinize every statement Sherman

made to hypothesize whether the Defendant may consider it favorable or not.   However, none of

Sherman's statements (including the "predator" comment) were so obviously material and

favorable to the Defendant such that the Government's conclusion otherwise amounts to bad faith.[7]

---

[7] In considering whether Sherman's statements were so manifestly material such that it should have

At most, the Government was negligent in not recognizing how the Defendant may potentially view Sherman's statements as favorable and not taking every step to ensure that he remained in the country despite his deportation proceedings; but, again, negligence does not amount to bad faith. *Cf. United States v. Revolorio-Ramo*, 468 F.3d 771 (11th Cir. 2006).   Moreover, having found above that the Defendant has failed to demonstrate Sherman would offer material and favorable testimony, I cannot find that the Government acted in bad faith.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, I respectfully **RECOMMEND** that the Defendant's Motion to Dismiss [DE 29] be **DENIED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.   Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained

---

prompted the Government to hold him on a material witness complaint, as the Defendant suggests, I do find it significant that the Defendant did not take steps to preserve Sherman's testimony either.   As discussed above, the Defendant would have been well-aware from the outset of what testimony Sherman could provide.   Unlike a bystander or other witness of whom only the Government may have been aware, Sherman was living with and present next to the Defendant for the important events in this case.   Indeed, the Defendant's argument for Sherman's materiality stems from his familiarity with, and presence with, the Defendant.   At the evidentiary hearing, defense counsel argued that he could not have realized the significance of Sherman's potential testimony until he received discovery containing the recording of his interview.   However, if the proposed material purpose of Sherman's testimony is to accurately explain the innocent thoughts and motivations that led the Defendant and Sherman to go to the Broward Mall or leave the mall without the package – as the Defendant argues – then the Defendant would have been aware of these thoughts and motivations without discovery.   Otherwise, as described above, they would not be material to the question of the Defendant's knowledge or statement of mind.   Yet despite this awareness of both Sherman's potential testimony and the fact that he had been placed in deportation proceedings by at least June 22, 2020 (*see supra* note 4), the Defendant apparently took no steps to preserve Sherman's testimony (including through her own material witness application) until many months, and perhaps even a year, after her arrest. It is difficult for me to conclude that the materiality of Sherman's testimony was so obvious, and the need to detain him to preserve his testimony so urgent, that the Government's failure to recognize it amounted to bad faith, when the Defendant apparently did not recognize it either.

in this Report except upon grounds of plain error if necessary, in the interest of justice.   *See* 28

U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790,

794 (11th Cir. 1989); 11th Cir. R. 3-1.

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 7th day of December, 2021.

JARED M. STRAUSS
UNITED STATES MAGISTRATE JUDGE